**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF MASSACHUSETTS**

**EASTERN DIVISION**

| | |
|---|---|
| In re<br><br>PAUL F. SHANNON, JR., and JULIE I. SHANNON,<br><br>　　　　　　　　　　**Debtors**<br><br>PRIME RATE PREMIUM FINANCE CORPORATION, INC.,<br><br>　　　　　　　　　　**Plaintiff**<br><br>v.<br><br>PAUL F. SHANNON, JR.,<br><br>　　　　　　　　　　**Defendant** | Chapter 7<br>Case No. 11-18113-FJB<br><br><br><br><br>Adversary Proceeding<br>No. 11-1337 |

**MEMORANDUM OF DECISION**

　　　Paul F. Shannon, Jr. (the "Debtor") filed a voluntary chapter 7 petition, jointly with his wife Julie I. Shannon, on August 26, 2011.  The Debtor, an insurance agent or broker, operated insurance agencies known as the Shannon-Transit Insurance Agency ("Transit") and Shannon Insurance, LLC ("Shannon").  In October 2008, the Debtor signed an agency agreement with Prime Rate Premium Finance Corporation ("Prime"), by which the Debtor, through Transit and Shannon, offered premium financing alternatives to clients that preferred not to pay the full amount of their insurance premium at the time that they acquired an insurance policy.  The Debtor guaranteed performance under the agency agreement. Through this program, the Debtor could offer clients an opportunity to finance premiums through Prime.

Now, by an adversary complaint filed on November 30, 2012, Prime seeks a judgment that certain claims it holds against the Debtor are non-dischargeable under 11 U.S.C. § 523(a)(4).[1] After a two-day trial, closing arguments on a third day, and the submission of post-trial briefs, and on the basis of the findings and rulings set forth herein, the Court finds that Prime has met its burden of establishing nondischargeability as to the debt remaining in issue. Accordingly, a judgment of nondischargeability shall enter, excepting the Debtor's obligations to Prime from discharge to the extent of $59,771.00.

**The Facts**

Prime offered the testimony of Michael Martin, the Business Development Officer for Prime and its parent, Avco Credit Corporation, for the New England region. Martin described the business relationship between the Debtor and Prime. For a period of about two years, the Debtor offered his clients an opportunity to finance their insurance premiums through Prime. As the Debtor generated an insurance policy, he offered the insured three options: paying the premium in full, financing the premium through the insurer, and financing it through Prime. If the client wished to finance through Prime, the Debtor would log onto the Prime website and, using a template, designate the appropriate insurer, the effective date of the policy, the policy period, the total premium, and the policy number. The Prime website would then generate the required down payment, the amount financed, the annual percentage rate, the dollar cost of financing, and the required payments. The Debtor could then print out the so-called "Premium Finance Agreement" (hereinafter the "PFA"), which set forth the terms of the arrangement, and sign it as the "agent" or "producer." The Debtor would sign the PFA on behalf of the insured and fax it to Prime, which would in turn wire the amount of the premium financed to the Shannon Client Escrow Account (Acct. No. 4391) or the Transit Agency Client Escrow Account (Acct. No. 3475), both at the Bank of America (collectively the "Escrow Accounts").

---

[1] The complaint also included a count under § 523(a)(2), but Prime withdrew that count at trial.

Under the heading "AGENT/BROKER/PRODUCER'S CERTIFICATION," the PFA, in each iteration relevant to this proceeding, states as follows: the agent (the Debtor here) agrees to "hold in trust for [Prime] any payments made or credited to the insured through or to the undersigned, directly or indirectly." I therefore find that the Debtor was to hold the amounts deposited in his Escrow Accounts in trust for Prime. Moreover, Prime's witness testified that the funds paid into the Escrow Accounts were available for only two permissible disbursements: to pay the insurance premium for the customer identified in the PFA or to pay the Debtor a commission, generally in the amount of twenty percent of the total premium for the policy.

In essence, Prime argues that the Debtor converted to his own use amounts that Prime paid into the Escrow Accounts. At trial, Prime introduced evidence with respect to eleven policies as to which Prime alleges the Debtor converted to himself amounts that Prime had paid him as premium financing. The Debtor takes the position that he did not misappropriate any funds. Rather, he argues, he used those funds either to pay for insurance premiums due or to pay himself a commission.

In its complaint, Prime identified fifteen accounts as those that were converted by the Debtor. Following is a chart that summarizes the allegations of the complaint.

| Client | Premium Amount | PFA # | Eff. Date |
|---|---|---|---|
| RLT | $5,515 | 5585618 | 20-Apr-09 |
| Latham | 12,962 | 5644025 | 21-Aug-09 |
| Galway | 4,492.26 | 5618519 | 12-Jul-09 |
| Roque | 1,994 | 5660977 | 2-Nov-09 |
| Acme | 2,472 | 5666908 | 21-Oct-09 |
| RAC | 7,316 | 5681999 | 7-Dec-09 |
| RAC II | 7,989.14 | 5630010 | 6-Aug-09 |
| Gorditas | 8,646.34 | 5684288 | 15-Jan-10 |
| Ten Steak | 13,873.32 | 5685917 | 21-Jan-10 |
| Boojums | 1,604 | 5693664 | 1-Jan-10 |
| Brighton | 3,986 | 5691866 | 29-Jan-10 |
| Kamborian | 1,821 | 5629422 | 29-Jul-09 |
| Njoke | 4,164 | 5670732 | 6-Nov-09 |
| Dias | 5,172 | 5671863 | 4-Dec-09 |
| Keefe | 10,551 | 5685536 | 16-Dec-09 |
| TOTAL | $92,558 | | |

At trial Prime introduced evidence as to only eleven of these fifteen alleged incidents of conversion; Prime introduced no evidence as to the Roque, RAC II, Ten Steak, and Brighton policies. The amount that Prime alleged was converted was accordingly reduced from $92,558 to $59,771.

Prime's case relies in part on an alleged destruction or concealment of evidence—in other words, a claim of spoliation. Prime argues that the Debtor destroyed or concealed corporate records of Shannon and Transit, thus making it difficult or impossible for Prime to establish its case. Prime therefore asks that the Court draw negative inferences from this alleged destruction or concealment. Of course, before the Court may draw such an inference, Prime must establish that the Debtor in fact destroyed or concealed evidence. *Booker v. Massachusetts Department of Public Health*, 612 F.3d 34, 45-46 (1st Cir. 2010). The testimony concerning the fate of two computers and many boxes of paper records was muddled and inconclusive. Prime argued that the Debtor intentionally destroyed or concealed the records, both in hard copy and electronic format. The Debtor offered testimony that (i) the computers containing certain financial records of Shannon and Transit were "junked" when those entities stopped operations and (ii) that the paper files were destroyed in a flood. In response, Prime argued that if the computers were "junked," they were destroyed because the Debtor knew they

4

contained adverse evidence. As to the paper records, Prime offered evidence that the Debtor made an insurance claim for the flood, but I did not understand the connection between the insurance claim and the spoliation allegations. Prime offered evidence that the Debtor employed a person named Carol Chango at his agencies during the relevant time period and that Chango maintained a computer on which resided certain financial information relevant to the issues in this case. The testimony was disputed as to the fate of the computer used by Chango, or even whether she had access to the agencies' financial information. In any event, neither party called Chango as a witness to clear up any of the controversy regarding the missing evidence. I simply do not have sufficient evidence to drawn any inference about the spoliation of evidence in this case. Prime having failed to carry its burden as to spoliation, I cannot draw the inference Prime requests.

Nonetheless, there was evidence at the trial concerning the Debtor's customers and the fate of the funds paid to the Debtor's Escrow Account in trust for Prime.

**The Dias, Ngige, Latham and Keefe Policies**

The Dias, Ngige, Latham and Keefe policies were issued through an intermediary, a wholesale insurance entity known as Swett & Crawford Group, Inc. ("Swett"). The Dias, Ngige and Latham policies were issued by Northland Insurance Company through Swett. In the case of each of these clients, Prime sent funds to the Debtor that were earmarked for payment of premiums to Northland, but the Debtor never paid those funds to Northland or to Swett. The Debtor admitted at the trial that in each instance the funds were not used to pay Swett or Northland. The funds remained in the Escrow Accounts. The amounts paid into the Escrow Accounts for these policies were $5,172 for the Dias policy, $4,164 for the Ngige Policy, and $7,746 for the Latham Policy. (Prime's complaint states that there was also a second advance for this policy of $5,216, but Prime seeks a finding after trial only as to the $7,746.) Although the Debtor claims that he later used the funds to obtain other insurance coverage for these clients, he could not identify any documentation in his account records to support that assertion. I do not find the

Debtor credible on his statement that he used the funds from Prime to acquire other insurance coverage for these clients.

On the Keefe Policy, Prime delivered $10,551 to the Debtor in the Escrow Accounts. The Keefe Policy was placed by Swett for a policy to issue from Northland. But the funds were not paid to Northland and they remained in the Escrow Accounts. The funds were not returned to Prime, nor were they used to obtain insurance for Keefe. Again, although the Debtor testified that he used the funds to acquire other coverage for Keefe, there was no documentary evidence to support that assertion, and I do not find the Debtor credible on his oral statements to that effect.

**The Kambourian Policy**

Prime deposited $1,821 in the Escrow Accounts to finance an insurance policy for Jacob and Jamie Kambourian. According to the Debtor, he mistakenly identified the insurer as the Great American Company, when the actual insurer was Public Service Mutual Insurance Company. Moreover, the Debtor testified that the funds advanced to his Escrow Accounts for this policy remained in the Escrow Accounts. The Kambourian policy was not paid for in July 2009 when the funds were advanced for that purpose. In fact, a representative of Public Service testified through a deposition transcript that was admitted that a payment was made on the Kambourians' behalf in February 2010 for a policy effective in February 2010. It is unclear whether the payment to Public Service was for the 2009 policy or for another policy. The $1,821 advanced in July 2009 to the Debtor was not returned to Prime. I find the Debtor's allegation that he used the funds advanced in July 2009 in February 2010 to pay for coverage starting in October 2009 not credible. The Public Service witness denied that any coverage was placed with Public Service in 2009 through the Debtor for the Kambourians.

**The RLT Policy**

Prime deposited $5,515 into the Escrow Accounts in April 2009, intending to finance a premium for a client denominated RLT. The Debtor submitted a PFA for this coverage at that time and identified

6

Great American as the insurer. The Debtor admitted at trial that he never placed the insurance for RLT with Great American, but he contended that he used the funds to acquire insurance from an insurer called Continental. He testified that Great American declined to renew the policy for RLT, so the Debtor located alternative coverage through Continental. When asked to produce a check showing payment to Continental for the RLT account, the Debtor could not do so. He identified a check made payable to Continental, but that check was for a different time period and bore no writing that connected to the RLT account. Indeed, even the Debtor could not say that it was related to the RLT account. To the extent the Debtor claims that he used the funds for insurance coverage from Continental, I find that the Debtor's testimony was not credible.

**The Gorditas Policy**

Prime deposited $8,646 to the Escrow Accounts relating to insurance for an entity known as Gordidas. The Debtor faxed a PFA to Prime regarding Gordidas and indicated that the funds would pay premiums to Public Service Mutual, but the policy was cancelled immediately, and the premiums were never paid to Public Service Mutual. Gordidas found a new broker that placed its insurance, and the Debtor admitted that he never refunded the $8,646 to Prime. The Debtor was aware of the need to refund the premiums to Prime, but he never made the refund. Given the Debtor's other conduct, as well as his knowledge that he was required to refund amounts from Prime that were not used to pay premiums, I infer that the Debtor intended to fraudulently deprive Prime of these premiums.

**The Acme Policy**

In October 2009 the Debtor faxed a PFA to Prime for coverage attributable to an insured named Acme Antiques ("Acme") for placement with Great American Insurance Company. It is uncontested that Prime transferred $2,472 to the Escrow Accounts. Again, however, the funds were never paid over to Great American or returned to Prime. The Debtor testified that he never paid the premiums to Great American, but that he paid the funds to Public Service Mutual Insurance for the Acme coverage. A

7

witness from Public Service Mutual Insurance testified that although it issued a policy for Acme in January 2008, that policy was cancelled in July 2008 for nonpayment of premiums. She also testified that Public Service Mutual never issued a policy for Acme in October 2009 and never received a payment from the Debtor for an October 2009 policy for Acme.

**The Boojums Policy**

In January 2010, the Debtor faxed a PFA to Prime in order to finance a policy for an insured known as Boojums. According to the PFA, the policy was to be placed with Great American, and in return Prime paid $1,604 to the Escrow Accounts. The Debtor admitted that the policy was never issued by Great American and that the premiums were never paid to that insurer. Rather, he testified that the funds were paid to National Grange Insurance Company. But at his deposition the Debtor testified that the funds were paid to Public Service Insurance Company. Although the testimony is far from clear, it appears that of the $1,604, $401 was paid to Public Service and that coverage was obtained for the first quarter of the policy period. The remainder, $1,203, was retained by the Debtor and never paid to Prime and it was never paid to another insurer for coverage for Boojums.

**Galway Bay Policy**

In August 2009, the Debtor submitted a PFA to Prime to finance renewal insurance coverage for a business called Galway Bay. According to the PFA, the insurer was Great American Insurance Company. As a result of the PFA, Prime deposited $4,492 into the Escrow Accounts. At trial, the Debtor testified that the funds were never paid to Great American. Rather, he said, the funds were paid either to Public Service Insurance or to Continental Insurance. He then immediately changed his testimony and stated that the insurance was actually placed with National Grange Insurance. At his deposition, the Debtor testified that the policy was actually bound with Public Service Insurance Company, but there was testimony at trial by a Public Service representative that Public Service never issued a policy to Galway Bay. Moreover, Prime introduced all of the checks written by Debtor to National Grange

8

Insurance Company on and after July 2009 and there were no checks even approaching the amount of the premiums owed by Galway Bay and financed by Prime. I find the Debtor's testimony that he used the funds to pay for insurance coverage for Galway Bay to be not credible. He offered no check, declarations page, or other written evidence that he ever made such a payment even though he knew from the time of his pretrial deposition that this payment was in issue.

**The RAC Policy**

The Debtor faxed a PFA to obtain financing of certain premiums required to cover a business called the RAC. According to the PFA, the premiums were $7,989 and the carrier was Great American. The travel of these premiums is complicated. The premiums were intended to go to Great American, but in fact the money was not paid to Great American. The policy was placed with Public Service, and it appears that the premiums were paid to Public Service. But, soon after the policy was issued, Public Service cancelled the policy. The premiums were refunded to the Debtor, but there is no evidence of what happened to the funds that were refunded.

**The Escrow Accounts**

What became of the funds deposited by Prime in the Escrow Accounts? When the two escrow accounts were closed in March 2010, the Shannon Client Escrow Account had a negative balance of ($1,153) and the Transit Agency Client Escrow Account had a small balance of $2,762. Since proceeds from many loans were deposited into these common accounts, it is not clear whether the remaining small balance of $2,762 constitutes the proceeds of any one of the loans at issue. In any event, even if these funds are funds held in trust for Prime on one of the accounts in issue, the evidence is that they were neither used to pay for the insurance coverage for which they were advanced nor, failing that, refunded to Prime. The Debtor does not contend that he had moved the escrowed funds to another account for safe keeping for Prime's benefit. In the schedule of personal property he filed in his bankruptcy case, the Debtor indicated that at the time of his bankruptcy filing in August 2012, he and his

wife had total cash of approximately $4,200, including $3,956.40 in a "Sharon Credit Union Business Checking Account." The Debtor does not contend that these are funds he is holding in trust for Prime. In item 14 of his Statement of Financial Affairs, he indicated that there existed no property owned by another person that he held or controlled.

Prime introduced evidence that the Debtor used the Escrow Accounts for the payment of personal expenses at liquor stores, ski lifts, condominium complexes, electronics stores, and grocery stores. The Debtor also transferred thousands of dollars from the Client Funds Account to his personal accounts. He transferred relatively small amounts to his Commission Accounts, which would be the proper place to pay himself commissions when earned, but no commissions were earned for the policies in question because he never used the funds advanced by Prime to pay for the coverage for which they were advanced.

**ANALYSIS**

Exceptions to discharge are narrowly construed in favor of the debtor. The burden of proof is on the creditor to prove all applicable elements of the exception to discharge and to do so by a preponderance of the evidence. *McCrory v. Spiegel (In re Spiegel)*, 260 F.3d 27, 32 (1st Cir. 2001).

After the presentation of the evidence, Prime focused its arguments after the trial on one theory: that the Debtor engaged in embezzlement when he removed funds from the Escrow Accounts to his personal account or used funds in the Escrow Accounts for personal expenses. In so doing, Prime relies on that part of 11 U.S.C. § 523(a)(4) dealing with embezzlement: "[a] discharge [under Title 11] does not discharge an individual debtor from any debt . . . for embezzlement." The word embezzlement is not defined in the Bankruptcy Code, so courts have looked to the common law for a definition. *Neder v. United States*, 527 U.S. 1, 23 (1999) (following well-established rule of statutory construction that "[w]here Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the

established meaning of these terms"). Sitting by designation on the First Circuit Court of Appeals, Justice Souter defined embezzlement as "the fraudulent conversion of property of another by one who is already in lawful possession of it." *In re Sherman*, 603 F.3d 11, 13 (1st Cir. 2010). "Thus, to amount to embezzlement, conversion must be committed by a perpetrator with fraudulent intent[.]" *Id*. This would include using money entrusted to the alleged wrong-doer for his own purposes in a way that he knows that the entrustor did not intend or authorize. *Id*. Indeed, "[i]t is knowledge that the use of the property is devoid of authorization, *scienter* for short . . . that makes the conversion fraudulent and thus embezzlement." *Id*.

Judges in this district have identified three elements to the proof of embezzlement under section 523(a)(4): "(1) property rightfully in the possession of a non-owner; (2) non-owner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud." *Sherman v. Potapov*, 403 B.R. 151, 157 (D. Mass. 2009); see *Lacourse Buiders LLC v. D'Anello (In re D'Anello)*, 477 B.R. 13, 25-26 (Bankr. D. Mass. 2012). I therefore must apply these elements to the facts I have found above.

As described above, the Debtor created the Escrow Accounts as a place for Prime to deposit the proceeds of financings to be paid to the insurers identified on the PFA's or to the Debtor as commissions. The first element of embezzlement is plainly and easily met. The funds in the Escrow Accounts were rightfully in the possession of the Debtor.

But, under the terms of the PFA, the funds in the Escrow Accounts were held in trust for Prime until they were disbursed to the insurer identified on the PFA. Absent an amendment to the PFA, the Debtor was obligated to refund the funds to Prime if they were not used to pay to the named insurer. There is no evidence that the premiums were refunded; nor does the Debtor so contend. And I have found that the various premiums were not used to pay for the coverage for which they were advanced. When the two Escrow Accounts were closed in March 2010, only $2,762 remained in them, but there is

11

no evidence that even these monies were ever remitted to Prime. The Debtor knew that he was receiving the premiums for the purpose of paying for insurance with the insurer identified on the top line of the PFA. Failure to use the funds for that purpose is a misappropriation of the sort required to establish embezzlement, and the Debtor understood this. I therefore find that the second element of the required proof of embezzlement, misappropriation of the property to a use other than that for which it was entrusted, is met when the Debtor failed to return the premiums to Prime when they were not properly used to pay for coverage as indicated in the PFA.

Next I turn to the *scienter* requirement. In *Lacourse Builders LLC v. D'Anello (In re D'Anello)*, 477 B.R. 13 (Bankr. D. Mass. 2012), the court wrote the following about the *scienter* requirement: "Although the Court had no direct evidence of fraudulent intent, the circumstantial evidence surrounding the appropriation of funds by the Debtor compels the conclusion that appropriations were made with fraudulent intent." *Id*. at 17. The Debtor used the Escrow Accounts for the payment of personal expenses at liquor stores, ski lift, condominium complexes, electronics stores, and grocery stores. None of these transactions was even arguably for the expressed purposes of the Escrow Accounts: payment of insurance premiums or commissions. The Debtor transferred thousands of dollars from the Client Funds Account to his personal accounts. He transferred relatively small amounts to his Commission Accounts, but no commissions were earned for the policies in question because he never used the funds advanced by Prime to pay for the coverage for which they were advanced, and therefore even these advances were improper, and the Debtor knew them to be so. It is unmistakable evidence of fraud for the Debtor to use the trust funds in the Escrow Accounts as his personal pocketbook, and I so find.

Turning to the dollars and accounts at stake, I find that in each instance the funds transferred to the Debtor and placed in the Escrow Accounts in trust with the Debtor were not used for their stated purpose and were intentionally diverted to the Debtor for his personal purposes, which conduct amounted to an embezzlement. The amounts embezzled are as follows:

|    | Policy      | Amount      |
|----|-------------|-------------|
| 1  | Dias        | $5,172.00   |
| 2  | Ngige       | 4,164.00    |
| 3  | Latham      | 7,746.00    |
| 4  | Keefe       | 10,551.00   |
| 5  | Kambourian  | 1,821.00    |
| 6  | RLT         | 5,515.00    |
| 7  | Gorditas    | 8,646.00    |
| 8  | Acme        | 2,472.00    |
| 9  | Boojums     | 1,203.00    |
| 10 | Galway Bay  | 4,492.00    |
| 11 | RAC         | 7,989.00    |
|    | **TOTAL**   | **$59,771** |

**CONCLUSION**

In light of the foregoing, the court shall enter a judgment declaring that the debt of the Debtor to Prime is excepted from discharge to the extent of $59,771.00 under 11 U.S.C. § 523(a)(4).

Date:  November 4, 2014

_____
Frank J. Bailey
United States Bankruptcy Judge

13